*Dof 5/11/23*

# UNITED STATES DISTRICT COURT
### for the District of Arizona

United States Of America

v.

1. Oleg Sergeyevich Patsulya; and,

2. Vasilii Sergeyevich Besedin, aka Vasiliy Besedin;

Case No.: 23-3233MJ

**CRIMINAL COMPLAINT**

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### COUNT ONE

Beginning in or about May 2022 and continuing to on or about May 11, 2023, in the District of Arizona and elsewhere, the defendants OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN, AKA VASILIY BESEDIN, conspired to violate the Export Control Reform Act, in that defendants, together with each other and others, did knowingly and willfully conspire to export, attempt to export, and cause to be exported from the United States to Russia various aircraft parts and components, including but not limited to a Goodrich Brake Assembly, without first having obtained the required authorization and license from the United States Commerce Department.

In violation of 50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(A)-(G), (J), 4819(b); and 15 C.F.R. Parts 736.2(b)(1), (4), and (6), 746.8(a)(1).

### COUNT TWO

Beginning in or about May 2022 and continuing to on or about May 11, 2023, in the District of Arizona and elsewhere, OLEG SERGEYEVICH PATSULYA and VASILII SERGEYEVICH BESEDIN, AKA VASILIY BESEDIN, conspired to commit international money laundering, in that defendants did knowingly combine, conspire, and agree with each other and with other persons to commit offenses against the United States in violation of 18 U.S.C. § 1956, to wit: to transport, transmit and transfer and

attempt to transport, transmit and transfer a monetary instrument and funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, smuggling goods from the United States in violation of 18 U.S.C. § 554(a), all in violation of 18 U.S.C. § 1956(a)(2)(A).

In violation of 18 U.S.C. § 1956(h).

\*       \*       \*

I further state that I am a Special Agent from the Department of Commerce, Bureau of Industry and Security, Office of Export Enforcement, and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof:       ☒Yes       ☐ No

REVIEWED BY: Todd M. Allison & William G. Voit, AUSAs

Special Agent Justin Kent, BIS/OEE
Name of Complainant

Signature of Complainant

Subscribed and sworn to me telephonically on:

5/12/23 @ 7:24 AM
Date

at       Phoenix, Arizona
City and State

HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge
Name & Title of Judicial Officer

M Morrissey

Signature of Judicial Officer

## ELECTRONICALLY SUBMITTED STATEMENT OF PROBABLE CAUSE

I, Special Agent Justin Kent, being first duly sworn, hereby state:

### INTRODUCTION

1.      As described further below, this application sets forth probable cause that between at least May 2022 and continuing to on or about May 11, 2023, defendants OLEG SERGEYEVICH PATSULYA ("PATSULYA") and VASILII SERGEYEVICH BESEDIN, AKA VASILIY BESEDIN ("BESEDIN"), both Russian nationals living in the United States, conspired with each other and with others to send aircraft parts from the United States to Russia in violation of export laws and regulations and also to launder payments for those parts from Russia into the United States.

2.      Specifically, after the United States imposed new license requirements on exports to Russia following Russia's further invasion of Ukraine, PATSULYA and BESEDIN developed a scheme through which they could profit financially from shipping aircraft parts and components, including a Goodrich Main Landing Gear Brake Assembly, Part Number 2-1740-1 (the "Brake Assembly"), to Russian airline companies without the required licenses and authorizations.

3.      PATSULYA and BESEDIN, together and with others, carried out the scheme by fielding requests and orders for parts from various Russian airlines, including some that have had their export privileges temporarily denied by the Department of Commerce's Bureau of Industry and Security ("BIS").  The conspirators then sought to acquire the requested parts from aircraft-parts suppliers, many of which are located in the

United States.   Aware that their true clients were Russian airline companies, the conspirators falsely represented to U.S. suppliers and customs and law enforcement officials that their customers were entities other than Russian airlines, such as companies operating out of Turkey.  The conspirators attempted to conceal their illegal scheme by using intermediary companies as straw buyers and by transshipping the aircraft parts through third-party countries, including Turkey and the Maldives.

4.      PATSULYA and BESEDIN laundered payments for these parts from Russian accounts into bank accounts they controlled in the United States.  They used these foreign funds not only to purchase aircraft parts to further the scheme, but also for their own personal enrichment, including to withdraw large amounts of cash; and to fund lavish purchases, including in December 2022 more than $130,000 for a 2023 BMW 740i and more than $165,000 for a 2007 Sea Ray Sundancer 380 Cruiser.

**AGENT BACKGROUND**

5.      I am a Special Agent with BIS's Office of Export Enforcement ("OEE"), and I have been since January 2022. I am currently assigned to the Phoenix Field Office in Phoenix, Arizona, and my current responsibilities include investigating the illegal transfer and export of commodities, technology, and services from the United States, which are regulated by the U.S. Department of Commerce. Prior to my tenure with OEE, I spent seven years as a Special Agent with the Department of the Air Force, Office of Special Investigations, and am currently a Reservist with the Air Force Office of Special Investigations. During my tenure as a Special Agent, I have conducted and participated in

2

numerous investigations of criminal activity, including organized crime, narcotics trafficking, homicide, and export violations. I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am authorized by law to conduct investigations into alleged violations of federal law.

6.      Through training, experience, and conversations with other law enforcement agents, I have become familiar with a variety of means through which individuals and entities export and broker U.S.-origin and foreign-origin goods, in violation of the law.  I am generally aware of methods used in the illegal exportation of U.S. technology and goods.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, investigators, or witnesses. This affidavit is intended merely to show that there is sufficient probable cause for issuance of the complaint and does not set forth all of my knowledge about this matter. Statements recited are set forth in substance and in part unless otherwise indicated.

8.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that beginning in or about May 2022 and continuing to on or about May 11, 2023, PATSULYA and BESEDIN:

> a. conspired to violate the Export Control Reform Act, in that defendants, together with each other and others, did knowingly and willfully conspire to export, attempt to export, and cause to be exported from the United States to Russia various aircraft parts and components, including but not limited to the

3

Brake Assembly, without first having obtained the required authorization and license from the United States Commerce Department, in violation of 50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(A)-(G), (J), 4819(b); and 15 C.F.R. Parts 736.2(b)(1), (4), and (6), 746.8(a)(1); and

b.  conspired to commit international money laundering, in that defendants did knowingly combine, conspire, and agree with each other and with other persons to commit offenses against the United States in violation of 18 U.S.C. § 1956, to wit: to transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, smuggling goods from the United States in violation of 18 U.S.C. § 554(a), all in violation of 18 U.S.C. § 1956(a)(2)(A) &(h).

## DEFENDANTS AND ENTITIES

9.     PATSULYA is a Russian national who currently resides in Miami-Dade County, Florida.

10.     BESEDIN is a Russian national who currently resides in Miami-Dade County, Florida.

11.     MIC P&I, LLC ("MIC") is a Florida limited liability company with a principal place of business in Miami-Dade County, Florida. PATSULYA is the owner and operator of MIC, and BESEDIN is an employee of MIC, at times holding himself out as

4

the Vice President of MIC.  As laid out further below, PATSULYA and BESEDIN used MIC to perpetuate a scheme of purchasing export-controlled aircraft parts and components in the United States on behalf of Russian buyers.

12.    Turkish Company 1 was a company operating in Turkey, which holds itself out as an international freight-forwarding company.  MIC, PATSULYA, and BESEDIN used Turkish Company 2 to conceal the fact that their true customers were companies located in Russia.

13.    Turkish Company 2 was a company operating in Turkey.  MIC, PATSULYA, and BESEDIN used Turkish Company 2 to conceal the fact that their true customers were companies located in Russia.

14.    Russian Company 1 was a Russian company headquartered in Russia. Russian Company 1 holds itself out as a company that sells aviation parts, tools, and equipment, and that also provides servicing and maintenance for aircraft.

15.    Russian Airline Company 1 was a Russian airline company headquartered in Russia.  Russian Airline Company 1 was owned or controlled by Russia or a Russian national.

16.    Russian Airline Company 2 was a Russian airline company headquartered in Russia.  Beginning on or about June 24, 2022, Russian Airline Company 2 was the subject of a BIS Order Temporarily Denying Export Privileges.  The Order Temporarily Denying Export Privileges for Russian Airline Company 2 was renewed in another order published

on or about December 23, 2022.  Russian Airline Company 2 was owned or controlled by Russia or a Russian national.

17.     Russian Airline Company 3 was a Russian airline company headquartered in Russia.  Beginning on or about May 25, 2022, Russian Airline Company 3 was the subject of a BIS Order Temporarily Denying Export Privileges.  The Order Temporarily Denying Export Privileges for Russian Airline Company 3 was renewed in another order published on or about November 21, 2022.  Russian Airline Company 3 was owned or controlled by Russia or a Russian national.

## STATUTORY AND REGULATORY FRAMEWORK

### *The Export Control Reform Act and Export Administration Regulations*

18.     The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that for a number of enumerated reasons, "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, . . . be controlled . . . ."  50 U.S.C. § 4811(2).  To that end, the ECRA grants the President the authority to "control . . . the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons."  50 U.S.C. § 4812(a)(1).

19.     The ECRA further grants the Secretary of Commerce the authority to establish the regulatory framework.  50 U.S.C. §§ 4812, 4813, 4810(10).  Pursuant to that authority, BIS promulgated the Export Administration Regulations ("EAR"), Title 15,

Code of Federal Regulations, Parts 730-774, to regulate the export of goods, technology, and software from the United States.

20.     Through the EAR, BIS has reviewed and controlled the export of certain items from the United States to foreign countries. *See* 15 C.F.R. Parts 734.2-734.3. In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another. Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

21.     The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), which is set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items on the CCL are categorized by an Export Control Classification Number ("ECCN"), each of which has export control requirements depending on final destination, end use, and end user.

22.     Under the ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the ECRA or the EAR. *See* 50 U.S.C. § 4819(a)(1), (b). Furthermore, the ECRA prohibits the making of any false or misleading statement to BIS "in the course of

an investigation or other action subject to the Export Administration Regulations." *See* 50 U.S.C. § 4819(f).

*Expanded Export License Requirements for Exporting Items to Russia*

23.     On February 24, 2022, in response to Russia's further invasion of Ukraine, the United States Department of Commerce imposed new license requirements on exports and reexports to Russia.

24.     As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL required a license to be exported to Russia. *See* Volume 87, Federal Register, Page 12,226 (published Mar. 3, 2022).   As of April 8, 2022, the license requirement for export to Russia was expanded to cover all items on the CCL. *See* Volume 87, Federal Register, Page 22,130 (published Apr. 14, 2022).   These rules were eventually codified in Title 15, Code of Federal Regulations, Part 746.8, which states, "a license is required, excluding deemed exports and deemed reexports, to export, reexport, or transfer (in-country) to or within Russia or Belarus any item subject to the EAR and specified in any Export Control Classification Number (ECCN) on the CCL."

25.     Any requests for licenses to export items on the CCL to Russia were reviewed under a policy of denial. *See* 15 C.F.R. § 746.8(b).

*Temporary Denial Orders*

26.     In addition to the licensing and other requirements imposed by the EAR, BIS has the authority to issue orders temporarily denying all of a party's export privileges to prevent an imminent violation. *See* 15 C.F.R. § 766.24.   Under the ECRA and the EAR, it

8

is a crime to take any action that is prohibited by a temporary denial order issued by BIS. *See* 50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(J); 15 C.F.R. Part 736.2(b)(4)(i).

<em><u>Controls on Export of the Brake Assembly</u></em>

27.     The Goodrich Main Landing Gear Brake Assembly, Part Number 2-1740-1 is a carbon disc brake system that is used on Boeing 737 aircraft.  At all times relevant here, the Brake Assembly has been classified by BIS under ECCN 9A991.d ("parts" and "components," "specially designed" for "aircraft").     Pursuant to BIS regulations promulgated after Russia's further invasion of Ukraine, a license is required to ship goods classified as ECCN 9A991.d to Russia.     However, at no time relevant here did PATSULYA, BESEDIN, or MIC apply to the United States Department of Commerce for a license or any other authorization to export airplane parts and components, including the Brake Assembly, to Russia.

<strong><u>PROBABLE CAUSE</u></strong>

<em><u>The Criminal Scheme</u></em>

28.     Beginning in or around May 2022, MIC, through PATSULYA and others, began communicating via email with various Russian airline companies about supplying the companies with aircraft parts and components, including the Brake Assembly.[1]  In

---

[1] After initial investigation indicated that PATSULYA, BESEDIN, and MIC likely were exporting export-controlled aircraft parts to Russia in violation of law, investigators sought and obtained a warrant to search certain email accounts associated with the conspirators. This affidavit contains descriptions of a number of these email communications, including some that were written in Russian.  Where Russian-language emails are described, I have

furtherance of their efforts, PATSULYA and BESEDIN used online procurement marketplaces to submit requests for quotes to United States-based and international aircraft parts supply companies, including but not limited to Arizona Company 1, for various aircraft parts and components, including the Brake Assembly.

29.   Throughout the course of the criminal conspiracy, the conspirators acknowledged numerous times that there were "sanctions" on Russia.   In fact, the conspirators acknowledged that they were coping with the sanctions.

30.   For instance, on or about June 16, 2022, PATSULYA emailed an individual at a Russian procurement company believed to be in Moscow, Russia, about providing the company with electronic components.   In the email, PATSULYA stated, "[d]ue to the sanctions, we have incurred high costs for the export and transportation of products from the United States."

31.   Also, on August 31, 2022, PATSULYA emailed what was essentially a sales pitch to Russian Airline Company 3 seeking to secure Russian Airline Company 3 as a new customer.   As noted above, Russian Airline Company 3 was prohibited, pursuant to a May 25, 2022 BIS Temporary Denial Order, from receiving U.S.-origin goods subject to the EAR.   In the email, PATSULYA stated that his "group of companies" already had several Russian customers, including Russian Airline Company 1 and the Russian Federation's Ministry of Defense.   In the email, PATSULYA wrote:

---

relied on translations provided by commercially available auto-translation services and/or law enforcement personnel who speak and read Russian.

Hello [Representative of Russian Airline Company 3],

A group of companies comprising US-based MIC-P&I, LLC (Miami, Florida), [Turkish Company 1], [Russian Company 1] Russian Federation, is offering you the procurement of aviation parts, electronic components, and units for various types of aircrafts.

Our group of companies supplies goods to such companies as [Russian Airline Company 1 and other companies in Russia], affiliates of the Ministry of Defense of the Russian Federation, and [an additional company in Russia].

It works like this:

You sign a contract with [Russian Company 1] for delivery terms DDP Moscow, or with [Turkish Company 1] for delivery terms DAT Moscow. You make a prepayment in accordance with the contract, after which we deliver the goods to you within the agreed upon timeframe.

In light of the sanctions imposed against the Russian Federation, we have been successfully solving challenges at hand. Please consider us as an integrated supplier of goods for [Russian Airline Company 3].

Respectfully,

Oleg Patsulya

32.     In another example, on September 6, 2022, a United States-based aircraft parts company responded to a request for quote with a generic, automated email disclaimer. The disclaimer stated that, because of the Russian invasion of Ukraine, the company would not action any request from any party located in Russia or where the end user is located in Russia.  Upon receiving the automated email, PATSULYA forwarded the email to another person, warning, "Do not write to these freaks."

11

33.     Additionally, on or about September 27, 2022, a Russian Airline Company 2 representative emailed PATSULYA and advised that his prices were much higher than other suppliers, prompting PATSULYA to respond, in part: "Please note that we are quoting you on the cost of the product based on DDP Moscow conditions . . . . Given the sanctions against the Russian Federation, the cost of spare parts, logistics, and delivery time frames have gone up, in many instances there is a requirement to provide end user certificate, and we are taking care of these issues ourselves."

34.     As a final example, on or about October 10, 2022, a representative of Russian Airline Company 2 emailed PATSULYA memorializing a telephone conversation about documented sanctions on Russian Airline Company 2, and even attached to the email a copy of a June 24, 2022, press release issued by BIS announcing the Temporary Denial Order directed at Russian Airline Company 2.

**A.     Attempted Purchase of Export-Controlled Brake Assemblies from Arizona Company 1 for Export to Russian Airline Company 1**

35.     On or about June 28, 2022, a representative from Russian Airline Company 1 emailed PATSULYA an updated list of aircraft parts and components Russian Airline Company 1 was seeking to acquire.  The list included two units of the export-controlled Brake Assembly.

36.     On or about July 14, 2022, PATSULYA responded to Russian Airline Company 1's June 28 inquiry.  PATSULYA, purportedly on behalf of Turkish Company 1, provided a quote for the delivery (to Moscow) of various aircraft parts and components,

including two units of the Brake Assembly. PATSULYA quoted a cost of $102,060 per unit of the Brake Assembly.

37.    In response to one of BESEDIN'S requests for a quote to purchase seven units of the Brake Assembly, on or about August 8, 2022, a representative from Arizona Company 1 informed BESEDIN that (a) Arizona Company 1 had two overhauled units of the Brake Assembly in stock (serial numbers 6343 and 6350) and would look for the other five units requested by BESEDIN; and (b) Arizona Company 1 would sell the seven units for $65,000 each. The same day, PATSULYA, holding himself out as a representative of Turkish Company 1, emailed a representative of Russian Airline Company 1, and offered to sell, at marked up prices, the exact same two units of the Brake Assembly (serial numbers 6343 and 6350), with delivery to Moscow.

38.    On or about August 11, 2022, BESEDIN emailed Arizona Company 1's representative and requested quotes for brakes with less wear. That same day, a different representative from Arizona Company 1 responded to BESEDIN's request and offered to sell BESEDIN seven units of the Brake Assembly with less wear for $74,998.98 each. Later that day, PATSULYA emailed Russian Airline Company 1 and offered to supply two units of the Brake Assembly for $105,000 each with delivery to Moscow. In his email to Russian Airline Company 1, PATSULYA specifically referenced the serial number of one of the brake assemblies offered by Arizona Company 1 (serial number 6350).

39.    After receiving an email on or about August 16, 2022 from Russian Airline Company 1 containing a purchase order for two units of the Brake Assembly, PATSULYA

emailed Russian Airline Company 1 an invoice (No. PI-0017-022) to sell two units of the Brake Assembly at $105,000.00 each (for a total of $210,000.00) minus a credit of $62,140.50 from a prior transaction. The invoice was on Turkish Company 1 letterhead and contained account information for a Turkish bank account belonging to Turkish Company 1.

40.     The next day, Russian Airline Company 1 wired $147,859.50 from a bank account in St. Petersburg, Russia, to Turkish Company 1's Turkish bank account. Later, on or about August 22, 2022, an MIC bank account in the United States received a wire from Turkish Company 1's Turkish bank account in the amount of $140,366.53. The wire transfer notes referenced the corresponding invoice number (No. 0017-22).

41.     On or about August 18, 2022, BESEDIN emailed the representative from Arizona Company 1 and said, "I'm ready to order all 7 these [sic] parts, But I want to ask you to give me a better price so we can get closer to our request . . . ." After the Arizona Company 1 representative advised BESEDIN that the lowest price they could offer was $70,000 each, BESEDIN responded, "Ok, I'll talk to management and get back to you shortly."

42.     The next day, on or about August 19, 2022, BESEDIN emailed Arizona Company 1 a purchase order for seven units of the Brake Assembly. The purchase order reflected an offer to purchase the seven units for $70,000 each, for a total of $490,000. The purchase order was on MIC letterhead, listing PATSULYA's residence as MIC's business

14

address. The MIC purchase order listed Arizona Company 1 as the seller and listed MIC's address as the "ship to" address.

43.     On or about August 22, 2022, the Arizona Company 1 representative emailed BESEDIN that Arizona Company 1 had five units of the Brake Assembly ready to sell, two of which had very little wear, and attached paperwork related to each of the five units (serial numbers D0064P, 4774, 6580, 3316, and 3419). After receiving the paperwork, BESEDIN emailed it immediately to PATSULYA, and PATSULYA in turn emailed it to their customer for the brakes, Russian Airline Company 1.

44.     That same day, Arizona Company 1 emailed BESEDIN a document titled "Certificate of End-User and Export Control" and asked BESEDIN to complete the document prior to shipment. The document contained a variety of acknowledgements pertaining to compliance with U.S. export laws and regulations. BESEDIN later emailed the export compliance form to PATSULYA.

45.     On or about August 23, 2022, PATSULYA emailed an invoice to Russian Airline Company 1 referencing the purchase of five additional units of the Brake Assembly for $103,000 per unit (No. PL-0018-022). The invoice was on Turkish Company 1's letterhead and contained account information for a Turkish bank account. The same day, Russian Airline Company 1 emailed PATSULYA and confirmed the purchase of the five additional units of the Brake Assembly through a purchase order.

46.     After Russian Airline Company 1 confirmed the purchase, BESEDIN emailed Arizona Company 1 and said, "[W]e are definitely taking these 2 and waiting for

15

the rest, as you said they will arrive within 2 weeks, right?"  BESEDIN also told the Arizona Company 1 representative that "we would like to come to your wearhouse[sic] to buy these parts and at the same time get to know each other for further interaction."

47.     The completed export compliance form was signed by PATSULYA on behalf of MIC.  By signing the form, PATSULYA acknowledged and agreed: (a) the parts being purchased from Arizona Company 1 "are subject to Export Control Laws and Regulations, including, without limitations, the EAR and ITAR"; (b) that MIC would "not . . . export[], release[], or disclose[] [the parts and/or technology purchased from Arizona Company 1] to foreign nationals inside or outside the United Sates without first complying with all applicable Export Control Laws and Regulations"; (c) that MIC would not export or re-export parts "to any restricted/embargoed country as may be designated from time to time by the United States Government"; (d) that United States laws "prohibit the sale, transfer, export, re-export to, or participation in any export transaction . . . with individuals or companies listed in the U.S. Department of Commerce's Denied Persons List . . . ."; and (e) that MIC "will obtain any export licenses or prior approvals required by the United States Government prior to export or re-export . . . ."

48.     On or about August 30, 2022, Russian Airline Company 1 wired $515,000 from a bank account held at a bank in St. Petersburg, Russia, to a bank account belonging to Turkish Company 1 in Turkey.  Russian Airline Company 1 emailed PATSULYA proof of this payment for the brakes.  The proof of payment referenced the same invoice number (No. PL-0018-022) that PATSULYA had previously sent to Russian Airline Company 1.

49.    On or about September 1, 2022, BESEDIN emailed the Arizona Company 1 representative and asked him to "confirm the presence of the brakes we need, in what quantity . . ." and told the representative that he and PATSULYA would fly out to visit Arizona Company 1 the following week.

50.    On or about September 7, 2022, PATSULYA emailed multiple spreadsheets to the Arizona Company 1 representative.  The spreadsheets listed various aircraft parts and components along with part numbers and needed quantities.

51.    On or about September 7, PATSULYA and BESEDIN traveled to Arizona. On September 8 and September 9, 2022, PATSULYA and BESEDIN visited Arizona Company 1's offices and spoke with employees of Arizona Company 1.  PATSULYA and BESEDIN told them, among other things, that they would not be supporting any Russian customers.  Rather, PATSULYA and BESEDIN told representatives of Arizona Company 1 that they had many customers in Turkey and that the brakes they wanted to purchase from Arizona Company 1 would be going to Turkey.  PATSULYA and BESEDIN also told representatives of Arizona Company 1 that they would be interested in trying to purchase more of the parts that were listed in the spreadsheets that PATSULYA had previously emailed.

52.    On September 9, 2022, PATSULYA emailed himself a consolidated spreadsheet that included the identical lists of parts contained in the spreadsheets previously referenced.  In this version of the spreadsheet that PATSULYA emailed

himself, however, the lists of aircraft parts contained in the spreadsheet were specifically associated, by name, with Russian Airline Company 1 or Russian Airline Company 2.

53.     On or about September 15, 2022, PATSULYA transmitted two invoices showing transactions between MIC and Turkish Company 1—one invoice, bearing Invoice No. PI-0052-22, reflected MIC's sale of three units of the Brake Assembly to Turkish Company 1 for $97,800 each (for a total of $293,400.00); and the other invoice, bearing Invoice No. PI-0053-22, reflected MIC's sale of two units of the Brake Assembly to Turkish Company 1 for $97,800 each (for a total of $195,600.00).

54.     On or about September 20, 2022, an MIC bank account in the United States received a wire from Turkish Company 1 in the amount of $293,378.00.  The notes associated with the wire reference that the wire was for "Inv. No. PI-0052-22."

55.     On or about September 21, 2022, an MIC bank account in the United States received a wire from Turkish Company 1 in the amount of $195,578.00.  The notes associated with the wire reference that the wire was for "Inv. No. PI-0053-22."

56.     On September 20 and September 25, 2022, PATSULYA sent text messages via WhatsApp to the Arizona Company 1 representative in an effort to finalize the deal. In the September 25 message, PATSULYA stated, "We have negotiated with you the purchase of the 7 brakes and we have agreed the[sic] conditions of the deal.  To this day we are still waiting for you to send us the proform[invoice], in order to make the payment. . . ."

57.    Between on or about September 27, 2022, and to at least October 2022, BESEDIN and PATSULYA continued to submit requests for quotes to Arizona Company 1 for additional units of the Brake Assembly as well as other aircraft parts and components.

**B.    Purchase of Brake Assemblies from New York Company 1 and Attempted Export to Russian Airline Company 1**

58.    After the conspirators were unable to secure any units of the Brake Assembly from Arizona Company 1, they continued to try to obtain the part from other United States-based airplane parts supply companies.  In October and November 2022, BESEDIN and PATSULYA worked directly with a company based outside of the United States in an effort to find, acquire, and ultimately export from the United States multiple units of the Brake Assembly.

59.    On or about November 10, 2022, the company based outside of the United States sold two units of the Brake Assembly to MIC for $121,000.00 per unit, plus a management fee of $12,100.00 for a total of $254,100.00.

60.    To fulfill this sale to MIC, on or about November 10, 2022, the company outside of the United States purchased two units of the Brake Assembly from New York Company 1 for $121,000.00 each for a total of $242,000.00.  New York Company 1 had, in turn, secured the two sets for brakes from California Company 1.  The invoice for the transaction reflected that, although the company outside of the United States had purchased the two units of the Brake Assembly, the two units were to be shipped to MIC in Florida.

61.     On or about November 14, 2022, BESEDIN and PATSULYA caused $254,100.00 to be wired from MIC's bank account to a bank account belonging to the company based outside of the United States.

62.     On or about November 18, 2022, a representative from California Company 1 emailed BESEDIN and advised that there were 2 crates for pickup in the State of Texas. The subject line of the email was "Pickup Brakes PN 2-1740-1." On or about November 21, PATSULYA emailed an individual who worked for a freight forwarding company and provided him with the pickup address in Texas for "Brake 2-1740-1."

63.     Between on or about November 22, 2022, and November 23, 2022, BESEDIN traveled from Florida to Texas to inspect the two Brake Assemblies, which were being held by Texas Company 1.

64.     On November 23, 2022, the freight forwarding company retained by PATSULYA picked up the brake units in Texas, and afterwards, a representative from Texas Company 1 emailed BESEDIN and PATSULYA and provided them with a Bill of Lading for the two sets of the Brake Assembly. The Bill of Lading reflected that the cargo was being delivered to Maldivian Company 1 in the Maldives. The next day, PATSULYA forwarded the Bill of Lading from Texas Company 1 to a representative of Russian Airline Company 1, the true and intended end user.

65.     On or about November 28, 2022, PATSULYA emailed Texas Company 1 a copy of an "Export Compliance/End User Certification" in which PATSULYA falsely represented that he would "not export, re-export U.S. products, technology, or software to

20

. . . . Russia . . . unless otherwise authorized by the United State[s] Government." The form was signed by PATSULYA on behalf of MIC.

66.     On or about November 30, 2022, PATSULYA received copies of multiple forms that had to be filled out and signed for New York Company 1 before the units of the Brake Assembly could be shipped out of the United States. One of the forms, entitled, "Re Compliance with United States Export Regulations," advised that the purchaser of the Brake Assembly cannot (a) "sell, transfer, export, or re-export any [New York Company 1] products . . . to . . . Russia . . . or any other country on the United States Debarred List, unless otherwise authorized by the United States Government," and (b) that the purchaser would "obtain any licenses or approvals required by the United States Government prior to export or re-export of [New York Company 1] products . . . ." Another form, entitled, "Russia/Ukraine/Belarus Sanctions Certification," informed the purchaser of "the recent implementation of sanctions against Russia by the . . . United States, including, without any limitation, restrictions imposed by . . . the U.S. Department of Commerce, which has implemented new Russia license requirements and licensing policies for commercial aircraft components . . . ." These forms were later signed by an employee of a company based outside of the United States and then submitted to New York Company 1.

67.     On or about December 1, 2022, a CBP officer emailed a representative of New York Freight Forwarding Company 1, which was handling or coordinating transportation for the two Brake Assemblies that were located at Texas Company 1. The CBP officer directed the representative of New York Freight Forwarding Company 1 to

fill out a "Statement of Ultimate Consignee and Purchaser," also known as a BIS-711, and have the form signed by the ultimate consignee. The BIS-711 is a Department of Commerce form that requires the ultimate consignee for any item being exported out of the United States to provide accurate information about the final destination of the items and the intended use. BIS relies on the accuracy of BIS-711 forms to ensure proper enforcement of United States export laws and regulations.

68. On or about December 2, 2022, PATSULYA was informed of the request to fill out the BIS-711 by the person that MIC used to coordinate logistics. Upon receiving this request, PATSULYA emailed it to others and characterized the documents as "!!!! IMPORTANT." On or about December 5, 2022, PATSULYA circulated a version of the BIS-711 that he had filled out. This version listed Maldivian Company 1 as the Ultimate Consignee, but falsely listed PATSULYA as a representative of New York Company 1 and contained PATSULYA's signature.

69. On or about December 5, 2022, a representative of New York Freight Forwarding Company 1 emailed a completed BIS-711 back to the CBP officer. The version of the BIS-711 form that the CBP officer received listed Maldivian Company 1 in the Maldives as the Ultimate Consignee and bore the purported signature of an individual identified as the "General Manager" of Maldivian Company 1. The BIS-711 noted that the units of the Brake Assembly would only be resold in the Maldives for use or consumption in that country.

70.     On or about December 7, 2022, BESEDIN, PATSULYA, and others were copied on an email discussing the status of various purchases, by MIC, of aircraft parts and components. The email subject header was "PENDING update." The body of the email included the following: "1. Already paid," "2. Coordinate shipping," and "3. Update Excel." The email contained multiple attachments, one of which was an Excel spreadsheet. The spreadsheet showed multiple purchases of various airplane parts and components. The spreadsheet notated a purchase of two "brakes" from California Company 1 and had a status of "picked up."

71.     On or about January 3, 2023, a BIS agent emailed BESEDIN and asked about the identity of BESEDIN's customer for the two brake assemblies. In response, BESEDIN stated that his client was "an air company in the Maldives . . . ."

72.     Based on the facts stated above and my training and experience, I believe that PATSULYA, BESEDIN, and MIC acquired and attempted to have exported to Russian Airline Company 1 two units of the Brake Assembly that had been sourced from California Company 1, knowing that doing so would be unlawful. I further believe that PATSULYA, BESEDIN, and MIC conspired and attempted to conceal their unlawful scheme by, among other things, providing false information to aircraft parts suppliers and law enforcement about the true end destination and end user of the units of the Brake Assembly.

C.     **Receipt of Order to Export Brake Assemblies to Russian Airline Company 2**

73.     While the conspirators worked to fulfill orders for the Brake Assembly from Russian Airline Company 1, they also received similar orders from Russian Airline

Company 2, which, as described above and below, was the subject of a BIS temporary denial order at the time MIC was dealing with them.

74.     On or about September 15, 2022, Russian Airline Company 2 emailed unknown recipients a "(CRITICAL) BRAKES REQUEST" for ten units of the Brake Assembly. PATSULYA received this email and forwarded it to BESEDIN.

75.     On or about September 23, 2022, PATSULYA emailed a Russian Airline Company 2 representative and said that he had four units of the Brake Assembly with different wear levels that could be delivered to Moscow.

76.     As previously noted, on or about September 27, 2022, a Russian Airline Company 2 representative emailed PATSULYA and advised that PATSULYA's prices were much higher than other suppliers.  The same day, PATSULYA responded, in part, with: "Please note that we are quoting you on the cost of the product based on DDP Moscow conditions . . . .  Given the sanctions against the Russian Federation, the cost of spare parts, logistics, and delivery time frames have gone up, in many instances there is a requirement to provide end user certificate, and we are taking care of these issues ourselves."

77.     On or about October 3, 2022, PATSULYA emailed a Russian Airline Company 2 representative and told him that he had six units of the Brake Assembly in stock and could deliver them to Moscow for $165,000.00 per unit.  That same day, the Russian Airline Company 2 representative responded to PATSULYA with a purchase order.  The purchase order reflected a purchase by Russian Airline Company 2 from

Turkish Company 1 of six units of the Brake Assembly for $165,000.00 each, delivery to Moscow.

78.     On or about October 10, 2022, one of PATSULYA's associates emailed Russian Airline Company 2 representatives an invoice, copying PATSULYA on the email. The invoice was on Turkish Company 1 letterhead and reflected a purchase of six units of the Brake Assembly for $165,000.00 each (for a total of $990,000.00), delivery to Moscow. The invoice had a "Purchase Order No." of P0967022.

79.     As noted above, on or about October 10, 2022, a representative of Russian Airline Company 2 emailed PATSULYA and another person, stating, "Attached is the document that I was talking about on the phone. I do not have information about other sanctions in regards to our company." The attachment to the email was a copy of a June 24, 2022, press release issued by BIS announcing the Temporary Denial Order directed at Russian Airline Company 2.

80.     Between on or about October 14, 2022, and October 24, 2022, PATSULYA negotiated with Russian Airline Company 2 the details of how Russian Airline Company 2 could send payment for the units of the Brake Assembly to PATSULYA from Russian Airline Company 2's bank account in Russia through Turkish Company 1's bank account in Turkey. When PATSULYA and Russian Airline Company 2 ran into difficulties with transferring the money from Russian Airline Company 2's bank in Russia to Turkish Company 1's bank in Turkey based on issues arising from international sanctions on

Russia, they ultimately agreed to send the payment through Russian Company 1's bank account.

81.     On or about October 24, 2022, Russian Airline Company 2 sent PATSULYA two purchase orders for seven units of the Brake Assembly, both of which reflected the purchaser as Russian Airline Company 2 and the supplier as Russian Company 1.   One purchase order, bearing Purchase Order No. "P0966222" reflected the purchase of one used, overhauled unit of the Brake Assembly for $115,200.00.   The other purchase order, bearing Purchase Order No. "P0967022," reflected the purchase of six new units of the Brake Assembly for $198,000.00 each (for a total of $1,188,000.00).

82.     On October 27, 2022, a Russian Airline Company 2 representative emailed PATSULYA.   In the email, the representative advised that a payment for "brakes" pursuant to purchase order P0967022 was "scheduled for today."   The next day, on October 28, 2022, a Russian Airline Company 2 representative emailed PATSULYA advising that order P0967022 was paid.   The next day, PATSULYA was copied on an email in which Russian Airline Company 2's payment for the brakes was confirmed.

83.     On November 1, 2022, PATSULYA emailed himself an attachment.   The name of the attached file referenced Russian Airline Company 2 by name.   The attachment was an invoice, bearing Invoice No. PI-0068-22, for four units of the Brake Assembly for a price of $187,216.00 each for a total of $748,864.00.   The invoice showed MIC as the seller and shows Turkish Company 1 as the customer.

84.     On November 2, 2022, an MIC bank account in the United States received a wire transfer in the amount of $368,228.00 from Turkish Company 1 using a Turkish bank account. The notes accompanying the wire transfer reference the related purchase invoice, PI-0068-22.

85.     On November 3, 2022, an MIC bank account in the United States received a wire transfer in the amount of $380,592.00 from Turkish Company 1 using a Turkish bank account. The notes accompanying the wire transfer reference the related purchase invoice, PI-0068-22.

86.     On December 7, 2022, a Russian Airline Company 2 representative emailed PATSULYA and asked for an update on when the company could expect delivery of the brakes.

**D.     Purchase of Brake Assemblies from Florida Company 1 and Attempted Export to Russia to Supply Russian Airline Company 1 or Russian Airline Company 2**

87.     On or about December 8, 2022, Florida Company 1 offered to sell BESEDIN two units of the Brake Assembly for $118,000.00 each. BESEDIN responded on the same day that he wanted to buy both units.

88.     On or about December 8, 2022, BESEDIN emailed Florida Company 1 with a purchase order for three units of the Brake Assembly at $116,000.00 each for a total of $348,000.00. The Purchase Order reflected that the units of the Brake Assembly would be shipped to MIC in Florida. Florida Company 1 provided a Pro Forma Invoice confirming the deal for the three units of the Brake Assembly.

27

89.     On or about December 12, 2022, Florida Company 1 emailed BESEDIN a new Pro Forma Invoice (bearing invoice number Q338504), which included an additional unit of the Brake Assembly for a total of four units (serial numbers 2805, D0974, 1848, and 3988), at $464,000.00.

90.     On or about December 14, 2022, BESEDIN and PATSULYA caused $348,000.00 to be wired from an MIC bank account in the United States to Florida Company 1's bank account.   Two days later, on or about December 16, 2022, BESEDIN and PATSULYA caused an additional $116,000.00 to be wired from an MIC bank account in the United States to Florida Company 1's bank account.

91.     On or about December 20, 2022, BESEDIN informed Florida Company 1 that two units of the Brake Assembly he purchased were to be shipped to a company in the Maldives.

92.     On or about December 21, 2022, BESEDIN received an email warning him that "there is attention for any MALDIVES shipment from CUSTOMS BORDER PROTECTION OF USA." On or about December 27, 2022, BESEDIN contacted Florida Company 1 and told them that the shipment of the two units of the Brake Assembly was no longer going to the Maldives, but instead it was going to Turkish Company 2 in Turkey. Thereafter, on December 28, Florida Company 1 issued a commercial invoice that reflected this change requested by BESEDIN.

93.     On January 3, 2023, BIS detained a shipment containing two units of the Brake Assembly (serial nos. 2805 and D0974) at a freight forwarding company's location in Jamaica, New York.

94.     On or about February 6, 2023, the shipment of one additional Brake Assembly (serial no. 3988) was detained at the direction of BIS agents. The shipment was set to be shipped to Turkey. Contained with the shipping documents was a BIS-711 form that PATSULYA signed on February 4, 2023, on behalf of MIC. The BIS-711 form provided that the ultimate consignee was Turkish Company 2 for "supply of own stock" and "future resale to local airlines."

95.     Based on the facts stated above and my training and experience, I believe that PATSULYA, BESEDIN, and MIC purchased four units of the Brake Assembly from Florida Company 1 and intended to export those brake units to Russia to fulfill orders placed by Russian Airline Company 1 and Russian Airline Company 2.

**E.     Disposition of Criminal Proceeds**

96.     PATSUYA and BESEDIN undertook the above-described actions to enrich themselves with the profits of the criminal scheme. As described herein, those profits would be derived from payments made by Russian airline companies, which were ultimately funneled to MIC through third-party "straw buyers" located outside of the United States. Once in receipt of those funds, PATSULYA and BESEDIN used such funds not only to purchase the aircraft parts to be unlawfully exported, but also to enrich themselves for profit from the scheme.

29

97.     A review of the wire notes from the incoming international wires to MIC from Turkish Company 1 and Turkish Company 2—for the time period May 31, 2022 to January 31, 2023—demonstrate that wires totaling approximately $2,750,019.53 reference either an invoice number that can be traced to purchases of the Brake Assembly or specifically reference "brakes" or the part number 2-1740-1.

98.     Members of the conspiracy ultimately transferred hundreds of thousands of dollars from accounts in the name of MIC to other MIC accounts as well as personal accounts associated with PATSULYA, BESEDIN, and others.  Members of the conspiracy used funds deposited into the MIC accounts (the proceeds of the conspiracy) or transferred to other personal accounts to withdraw large amounts of cash and to fund lavish purchases. Indeed, in December, 2022, after having received substantial funds that originated with Russian airline companies in connection with the sale of export-controlled brake units, PATSULYA purchased (a) a 2023 BMW 740i; and (b) a 2007 Sea Ray Sundancer 380 Cruiser ("Side Chick").

**F.     Defendants' Interviews with BIS Agents in Boston and Phoenix**

99.     After at least one of their shipments had been detained, BESEDIN reached out, in December 2022, to a BIS Special Agent in an attempt to get the shipment released. BESEDIN and the Special Agent thereafter exchanged email messages and ultimately

BESEDIN agreed to travel to Boston, Massachusetts, with PATSULYA, to participate in a voluntary interview. The interview took place on February 2, 2023.[2]

100.   During the interview, PATSULYA and BESEDIN were dishonest in responding to questions from BIS about the end destinations and end users of the detained shipments. For example, when the BIS agents asked PATSULYA and BESEDIN about MIC's clients, PATSULYA and BESEDIN told the agents that they had two clients, Turkish Company 1 and Turkish Company 2. PATSULYA and BESEDIN told the BIS agents that their two clients worked closely with aviation companies and airlines in Turkey.

101.   At no time during the interview did PATSULYA or BESEDIN tell the BIS agents that they had entered into agreements with Russian Airline Company 1 and Russian Airline Company 2 to supply the Brake Assembly. Additionally, both PATSULYA and BESEDIN failed to tell the BIS agents that they had received money from Russian Airline Company 1 and Russian Airline Company 2 in furtherance of the purchases of the Brake Assembly.

102.   Subsequently, after additional MIC shipments had been detained, I exchanged email correspondence with PATSULYA about those shipments. In an April 13, 2023 email, PATSULYA wrote, "I send you documents on the delayed goods." Among

---

[2] At the beginning of the interview, PATSULYA and BESEDIN were asked about their proficiency in the English language. BESEDIN responded that he speaks English but not "very well," and PATSULYA indicated that he only speaks a bit of English. During the interview, BESEDIN fielded most of the questions and frequently translated questions and answers.

the paperwork provided by PATSULYA were documents pertaining to the purchase, sale, and shipment of some of the Brake Assemblies referenced in this affidavit. None of the paperwork identified Russian Airline Company 1 or Russian Airline Company 2 as the purchaser or end user of the Brake Assemblies.

103.   Ultimately, PATSULYA agreed to travel to Phoenix, Arizona to meet with me to discuss the detained shipments. PATSULYA and BESEDIN flew from the Miami, Florida area to Phoenix on May 10, 2023.

104.   I met with PATSULYA and BESEDIN on the morning of May 11, 2023. At approximately 9:00 a.m. Arizona time, PATSULYA and BESEDIN arrived at a Customs and Border Protection (CBP) facility in Phoenix to meet with me. At the outset of the meeting, I told PATSULYA and BESEDIN that for their detained shipments to be released they needed to fill out the BIS-711 forms truthfully.

105.   During the meeting, a Russian linguist translated for PATSULYA and BESEDIN. I reviewed the BIS-711 forms, which had been translated into Russian, with PATSULYA and BESEDIN and explained the terms "ultimate consignee" and "end use." PATSULYA and BESEDIN told me that all of the detained shipments were intended for Turkish Company 1 and Turkish Company 2 in Turkey. They said that Turkish Company 1 and Turkish Company 2 were resellers. At the end of the meeting, I asked them if any of the detained shipments were intended to go to Russia or Belarus, and they confirmed that none were. At this point in the meeting, law enforcement arrested PATSULYA and BESEDIN.

## CONCLUSION

106.    Based on the foregoing, there is probable cause to conclude that beginning in or about May 2022 and continuing to on or about May 11, 2023, in the District of Arizona and elsewhere, the defendants conspired to violate the Export Control Reform Act and conspired to commit international money laundering.

107.    This affidavit is being sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose.  I have thoroughly reviewed the affidavit and attest that there is sufficient evidence to establish probable cause that the defendant committed the crimes alleged.

Pursuant to 28 U.S.C. § 1746(2), I declare that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted,

Justin Kent
Special Agent, Department of Commerce
Bureau of Industry and Security/Office of
Export Enforcement

Subscribed and sworn to me telephonically on ___May 12___, 2023

HONORABLE MICHAEL T. MORRISSEY
United States Magistrate Judge